USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/19/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

NRG ENERGY, INC.,

                              Plaintiff,                09 Civ. 2448 (JGK)

          - against -                                   OPINION AND ORDER

EXELON CORPORATION AND EXELON XCHANGE
CORPORATION,

                              Defendants.
_____

JOHN G. KOELTL, District Judge:

     This litigation is an attempt by the target of a purported

hostile takeover bid to require the acquiring company to admit

in its public disclosures that it will not complete the hostile

takeover but will only complete the deal on a negotiated basis.

The acquiring company says that it means what it says and that

it will complete the takeover, if its conditions are met, even

if the acquiring company's board of directors remains opposed to

the deal.  Rather than simply saying no to any deal, and calling

the acquiring company's bluff, the target has brought this

litigation to force disclosure of the acquiring company's

alleged true intentions.

     On October 19, 2008, Exelon Corporation ("Exelon") proposed

a consensual merger to the Board of Directors of NRG Energy,

Inc. ("NRG").  NRG rejected the proposal.  On November 12, 2008,

Exelon commenced a stock-for-stock exchange offer directly to

the NRG shareholders whereby those shareholders could tender

their shares of NRG common stock at a fixed exchange ratio of 0.485 Exelon shares for each NRG common share (the "Exchange Offer"), the same ratio that was proposed to the NRG Board in the merger proposal. In connection with the Exchange Offer, Exelon filed an S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission (the "SEC") setting forth various conditions of the Exchange Offer and stating that the purpose of the Exchange Offer was for Exelon to acquire all of the outstanding shares of NRG common stock, provided those conditions were satisfied. As of February 25, 2009, Exelon had received over 51% of all outstanding shares of NRG common stock, and extended the deadline to tender shares into the Exchange Offer until June 26, 2009. On June 17, 2009, Exelon extended the deadline to tender shares until August 21, 2009.

NRG claims that Exelon harbors a secret intent not to close the Exchange Offer even if all of the conditions of the Exchange Offer are satisfied. NRG alleges that the Exchange Offer is strictly a bargaining tactic to pressure the NRG Board into agreeing to a consensual merger that would be far less costly than closing the Exchange Offer. NRG brings this action under Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), seeking a corrective disclosure in Exelon's S-4 to that effect. NRG also seeks an injunction requiring Exelon to withdraw its Exchange

Offer for 60 to 90 days, after which Exelon could recommence a
new offer that it genuinely intended to close.

The Court conducted a non-jury trial on June 1 and June 3,
2009.  Having considered the evidence, assessed the credibility
of the witnesses, and reviewed the parties' post-trial
submissions, the Court makes the following findings of fact and
reaches the following conclusions of law.

## FINDINGS OF FACT

### The Parties

1.   NRG (or, "the plaintiff") is an independent power company
that builds, owns, and operates power plants and provides
electricity to competitive markets and customers throughout the
United States.  (Tr. 22-23.)

2.   Exelon Corporation is a public utility holding company that
distributes electricity to approximately 5.4 million customers
in Illinois and Pennsylvania, and natural gas to approximately
485,000 customers in southeastern Pennsylvania.  Exelon
Corporation operates the largest fleet of nuclear power plants
in the United States.  (Defts.' Ex. 52 at 19.)  Exelon Xchange
Corporation is a direct, wholly-owned subsidiary of Exelon
Corporation that was formed for the sole purpose of acquiring

the outstanding shares of NRG common stock and consummating a
subsequent merger of Exelon Xchange (or another wholly-owned
subsidiary of Exelon) with and into NRG.  It is a "shell
company" with no assets.  (Tr. 239; Pl.'s Ex. 475 at NRG36150.)
Exelon Corporation and Exelon Xchange Corporation are
collectively referred to herein as "Exelon" or "the defendants."


### The Rejection of the Merger Proposal and the Commencement of the Exchange Offer

3.    On October 19, 2008, John Rowe, Chairman and Chief
Executive Officer ("CEO") of Exelon, sent a letter to NRG
proposing a negotiated merger of the two companies.  The
proposal provided that "Exelon would acquire all of the
outstanding shares of NRG common stock at a fixed exchange ratio
of 0.485 Exelon shares for each NRG common share."  (Defts.' Ex.
52 at 23; see also Tr. 224.)  The proposal represented
approximately a 37% premium for NRG shareholders.  (Tr. 31-32;
Defts.' Ex. 52 at i.)


4.    On November 9, 2008, NRG's board of directors (the "NRG
Board") rejected Exelon's proposal to negotiate a merger
agreement premised upon the 0.485 exchange ratio.  (Tr. 128;
Defts.' Ex. 52 at 27-31.)


4

5.    On November 10, 2008, Exelon's board of directors (the "Exelon Board") unanimously approved the Exchange Offer, which extended directly to NRG shareholders the opportunity to secure the same exchange ratio that had been rejected by the NRG Board. (Tr. 133, 385; Defts.' Ex. 13 at EXC0001326-29.)

6.    On November 12, 2008, Exelon commenced the Exchange Offer and filed its initial S-4.  (Defts.' Ex. 40.)

7.    According to the initial S-4, "[t]he purpose of the [Exchange Offer] is for Exelon to acquire control of NRG, and ultimately all of the outstanding shares of NRG common stock. The offer, as the first step in the acquisition of NRG, is intended to facilitate the acquisition of NRG."  The initial S-4 represented that the Exchange Offer would be followed by a second-step merger "as promptly as practicable after Exelon Exchange accepts for exchange shares of NRG common stock pursuant to the [Exchange Offer]."  (Defts.' Ex. 40 at 45.)

8.    The initial S-4 disclosed that "Exelon has publicly expressed a desire to enter into a negotiated business combination with NRG . . . . Exelon intends to continue to seek to negotiate with NRG with respect to the combination of NRG and

Exelon."   The initial S-4 further disclosed that "the structure
of a combination between Exelon and NRG under any such
definitive merger agreement may be different from the structure
of the offer and second-step merger.   Accordingly, such
negotiations could result in, among other things, the
termination of the [Exchange Offer] and submission of a
different combination proposal to NRG's stockholders for their
approval."   (Defts.' Ex. 40 at 44-45.)

9.   The initial S-4 has been amended four times, most recently
on May 20, 2009.   (See Defts.' Exs. 45, 49, 52, 55.)   Each
version of the S-4 includes the information and disclosures
described above.   The document referred to herein as "the S-4"
is the third amended S-4, which was the prevailing S-4 at the
time this action was filed.   (Defts.' Ex. 52.)

10.   The S-4 disclosed that the Exchange Offer was subject to a
number of conditions.   Those conditions include: the
inapplicability of Delaware General Corporation Law ("DGCL") §
203; regulatory approvals; Exelon shareholder approval of the
issuance of necessary shares; and the effectiveness of the S-4.
(Defts.' Ex. 52 at 52.)

11.   As of February 25, 2009, Exelon had received over 51% of
all outstanding shares of NRG common stock pursuant to the
Exchange Offer, and extended the deadline to tender shares into
the Exchange Offer to June 26, 2009.   (Tr. 62, 291-92; Defts.'
Ex. 52 at 34.)   On June 17, 2009, two weeks after the conclusion
of the trial, the Court received correspondence from the parties
indicating that Exelon had extended the deadline to tender
shares into the Exchange Offer to August 21, 2009.

12.   Prior to June 17, 2009, Exelon had not believed that it
would obtain all of the regulatory approvals required to close
the Exchange Offer by June 26, 2009.   (Tr. 292.)   Exelon never
represented that it planned to close the Exchange Offer by that
time, and neither party contends that June 26, 2009 constituted
a deadline by which the Exchange Offer had to close.   Indeed,
prior to June 17, 2009, Exelon had already extended the Exchange
Offer twice.   (Pl.'s Ex. 1 at NRG719-20; Defts.' Ex. 52 at 34.)

## Direct Evidence Regarding Exelon's Intent to Close the Exchange Offer Provided the Conditions are Satisfied

13.   During the course of the trial, several senior Exelon
executives testified with respect to Exelon's intent to close
the Exchange Offer provided the conditions of the Exchange Offer
are satisfied.   Those executives were: Chairman and CEO John

7

Rowe; Senior Vice President and Chief Financial Officer ("CFO")
Matthew Hilzinger; Executive Vice President and General Counsel
William von Hoene, Jr.; President and Chief Operating Officer
("COO") Christopher Crane; and the presiding director of the
Exelon Board, Walter D'Allesio.  Each of those Exelon executives
testified that Exelon intends to close the Exchange Offer
provided the conditions of the Exchange Offer are satisfied.
(Tr. 124, 216, 283, 317, 394-95.)

The Court finds the testimony of the Exelon executives
credible.  No Exelon witness testified to any secret intent not
to close the Exchange Offer.  No witness called by NRG testified
to any personal knowledge with respect to any intent by Exelon
not to close the Exchange Offer.  The circumstantial evidence,
discussed below, does not undermine the credibility of the
Exelon executives' testimony regarding Exelon's intent to close
the Exchange Offer, and indeed supports the proposition that the
Exchange Offer would be economically beneficial for Exelon and
therefore there is an economic incentive to close the Exchange
Offer if a negotiated transaction cannot be achieved.

## Circumstantial Evidence Regarding Exelon's Intent to Close the Exchange Offer Provided the Conditions are Satisfied

14.  NRG relies upon circumstantial evidence in its effort to
prove that Exelon harbors a secret intent not to close the

8

Exchange Offer even if all of the conditions of the Exchange Offer are satisfied.   The central fact around which NRG builds its case is that closing the Exchange Offer would cost Exelon far more than acquiring NRG through an alternative negotiated transaction.   As the Court made clear in denying the motion to dismiss this action, circumstantial evidence plainly may be used to establish a fraud claim.   However, the circumstantial evidence in this case does not support NRG's claim.   Exelon has made clear that it would prefer to arrive at a negotiated transaction but that is not inconsistent with an intent to close the Exchange Offer if NRG is unwilling to enter into a negotiated transaction.   The circumstantial evidence relied upon by NRG, discussed below, does not support a finding that NRG harbors a secret intent not to close the Exchange Offer even if the conditions of the Exchange Offer are satisfied.

The Court now turns to the circumstantial evidence.

### The Relative Costs of the Exchange Offer and an Alternative Negotiated Business Combination

15.   Any business combination between Exelon and NRG would require Exelon to refinance some amount of NRG's debt.   NRG's debt instruments fall roughly into two categories: (1) NRG's bank debt of approximately $4.0 billion, and (2) NRG's bondholder debt of approximately $4.7 billion.   (Tr. 35.)

16.   The consummation of the Exchange Offer would trigger
certain change of control provisions contained in NRG indentures
that would require Exelon to refinance both the bank debt and
the bond debt.   (Tr. 35-36.)   NRG's Executive Vice President of
Strategy who testified at trial, Jonathan Baliff, estimated that
the total amount of debt that would have to be refinanced if the
Exchange Offer were closed is approximately $8.5 billion.   (Tr.
34.)[1]   Moreover, the bond debt would have to be refinanced at a
higher interest rate than the current rate, resulting in annual
incremental interest costs for the term of the bonds.   (Tr. 39.)

17.   If NRG agreed to enter into a consensual transaction with
Exelon, the companies could structure the transaction as a
"TopCo" merger instead of a stock-for-stock exchange.   Under a
TopCo structure, Exelon would merge with and into NRG, such that
NRG would be the surviving corporation.   Exelon considered the
TopCo structure at least as early as October 28, 2008, which was
before it commenced the Exchange Offer.   (Pl.'s Ex. 739 at
EXC1318.)   The TopCo structure would avoid the need for Exelon
to refinance NRG's bond debt.   (Pl.'s Ex. 739 at EXC1318; Tr.
372.)   The Court accepts, for purposes of this dispute, the

---

[1]      The amount of total debt was also referred to variously at trial as
$8.4 billion, $8.75 billion, and other figures within that range.   Which
figure is the most accurate among those used by the different witnesses at
trial is not material to the resolution of this dispute.

plaintiff's assertion that a TopCo merger would cost less for Exelon than closing the Exchange Offer, and that Exelon would therefore rather negotiate a TopCo merger than close the Exchange Offer, although it should be noted that there was little development of the evidence at trial regarding the potential costs of a TopCo structure.

### Exelon's Ability to Finance the Exchange Offer

18. Exelon is capable of refinancing the entire debt that would need to be refinanced in order to close the Exchange Offer. Both the plaintiff's and the defendants' witnesses testified to that capability. (Tr. 37 ([Mr. Baliff]: "I think on the capability, I would have to say that I think Exelon has the capability to refinance and close the exchange offer."), 127-28, 218-19, 280, 325-26, 329-30, 389-90, 464-65.)

19. NRG points to the fact that, at the time Exelon commenced the Exchange Offer, it did not have financing commitments in place to refinance the entire amount of debt that would need to be refinanced in order to acquire NRG through the Exchange Offer. (Tr. 348.) Exelon still does not have those financing commitments in place. (Tr. 356-57.)

20.   However, there were sound business reasons not to obtain
binding financial commitments in advance.  Obtaining financing
commitment letters from banks requires significant up-front
expense.  (Tr. 137.)  Moreover, financing commitments expire
after limited terms.  (Tr. 137.)  Exelon expects the Exchange
Offer to be pending for a long period of time.  (Tr. 137.)
Financing commitments obtained too far in advance of the closing
of the Exchange Offer would have to be re-negotiated at further
expense.  (Tr. 137.)

21.   Exelon believes there is a strong possibility that
notwithstanding its ability to refinance the entirety of NRG's
bank debt and bond debt, it will not have to refinance all of
the bond debt.  That belief is based on a number of factors.
First, Exelon believes it can negotiate an agreement with the
NRG bondholders in which the bondholders waive their change of
control rights in exchange for payment of an amount less than
the cost of refinancing the entire bond debt.  (Tr. 328-29.)
Second, Exelon believes that the NRG Board will eventually agree
to a consensual business combination, which might obviate the
need to refinance the entire bond debt.  (Tr. 413.)  Indeed, one
of the purposes of the Exchange Offer is to pressure the NRG
Board into consenting to an alternative business combination,
namely a TopCo merger.  (See, e.g., Pl.'s Ex. 17 at EXC0001196

(noting that Exchange Offer "may pressure NRG management to
discuss negotiated transaction"); Tr. 400-02.)   Third, as NRG
itself points out repeatedly, several of the conditions of the
Exchange Offer have not been satisfied and would be difficult to
satisfy, with the result that Exelon lacks "certainty that the
transaction could be effectuated".   (Tr. 137.)

22.   For the reasons explained above, Exelon's present lack of
financing commitments for the entire NRG debt does not support a
finding that Exelon secretly intends never to close the Exchange
Offer.   It only reflects Exelon's reasonable decision not to pay
in advance for something that it may not need.

### Exelon's Assumption That It May Have to Refinance the Entire NRG Debt

23.   From the time of the merger proposal that Exelon sent to
the NRG Board on October 19, 2008, Exelon had contemplated the
possibility that it would have to refinance NRG's entire bond
debt, as well as the bank debt, in order to acquire NRG.   (Tr.
127-28, 319-21.)

24.   Exelon has considered a variety of ways to finance the bond
debt, including bank financing, renegotiation of existing debt,

13

equity issuance, asset sales, private equity financing, and going directly to the capital markets.  (Tr. 321-22, 326-27.)

25.   Prior to the commencement of the Exchange Offer, Mr. Hilzinger met with numerous banks, three of which - Barclays, The Royal Bank of Scotland Group, and UBS - orally committed to provide $4.5 billion of debt financing for the transaction.[2] (Tr. 325-26.)  Each of those banks is also a financial advisor to Exelon with respect to the Exchange Offer.  (Defts.' Ex. 52 at 62-64.)  A number of other banks Mr. Hilzinger met with were conflicted or had policies against committing to provide financing while an exchange offer is hostile.  (Tr. 326.) However, those banks "all indicated strongly" to Mr. Hilzinger that "they would be there with their full support" upon the consummation of the Exchange Offer.  (Tr. 326.)  After the Exchange Offer was commenced, several additional banks approached Exelon to offer financing for the transaction.  (Tr. 358.)

26.   The possibility of financing the entire NRG debt was discussed at Exelon Board meetings on October 28, November 3, and November 10, 2008.  (Tr. 129, 323-24, 463.)

---

[2]     JP Morgan Chase & Co. ("JP Morgan") later also made an oral commitment to provide part of the $4.5 billion of debt financing for the transaction. (Tr. 351-52.)

27.   NRG argues that a set of slides presented at the November
3, 2008 Exelon Board meeting show that the Exelon Board
considered financing only the amount that might be necessary for
a TopCo merger at that meeting.   (Defts.' Ex. 12.)   The slides
do not support that finding.   Indeed, the slides support the
contrary inference that at the time of the November 3 Board
meeting, Exelon was contemplating the possibility of closing the
Exchange Offer even in the event it could not complete a less
costly business combination in the form of a TopCo merger.
(Defts.' Ex. 12 at EXC0001190 (noting under heading "status of
the deal" that "Exelon sought financing commitments for $8
billion to refinance NRG debt"), EXC0001201 (listing Exchange
Offer as one of several alternative structures for acquiring NRG
and noting structural advantage that it "allows for possible
streamlined PUC approval in Pennsylvania"), EXC0001202
(referring to TopCo structure as "preferred").)

      The slides do indicate that at the time of the November 3,
2008 meeting Exelon expected that it would only need to
refinance the bank debt (Defts.' Ex. 12 at EXC0001207) –
presumably because the deal would turn friendly – but that
expectation is consistent with the statements of Exelon
executives at trial that although they would prefer a negotiated
business combination and believe that one will ultimately occur,

Exelon would be willing to close the Exchange Offer if its conditions were satisfied.  (Tr. 413.)  Indeed, the slides include two slides which purport to contrast the value accretion or dilution under a TopCo merger with that which would result from closing the Exchange Offer, although the actual comparison is redacted.  (Defts.' Ex. 12 at EXC0001215-16.)  Regardless of the substance of the comparison, the mere fact of the comparison reflects that closing the Exchange Offer was contemplated.[3]

28.  NRG argues that certain statements made in a November 11, 2008 press release issued by Exelon and related documents prepared by Exelon in connection with the Exchange Offer reveal that at the time the Exchange Offer was made Exelon was only contemplating the need to finance an amount necessary to complete a TopCo merger.[4]  The press release and the related documents do not support that finding.  NRG represents that the press release asserts that "financing is not an obstacle" because "a negotiated business combination can be structured" to avoid the change of control provisions.  (Pl.'s Ex. 15 at

---

[3]     NRG rightly points out that because materials concerning the cost comparison between the Exchange Offer and a TopCo merger have been redacted upon Exelon's invoking a business strategy privilege, Exelon cannot argue that there is no significant difference in cost between the two structures. However, the argument that the fact that a cost comparison between the two structures was undertaken shows that both structures were contemplated is a distinct argument that has nothing to do with the substance of the redacted material.
[4]     Exelon objects to the admissibility of these materials but the Court has considered them for purposes of this dispute.  They do not affect the outcome of this dispute.

16

EXC008911.)  That is misleading because NRG has taken the quoted language out of context.  The quoted language is actually from a letter from Exelon to the NRG Board that was attached to the press release.  The letter entreats the NRG Board to enter into a negotiated transaction.  It is hardly "damning evidence of fraud," as NRG would have it, for Exelon to urge the NRG Board to agree to a consensual merger even as Exelon launches the Exchange Offer.  Exelon's intention to do just that was disclosed in the initial S-4 and all of the subsequent amended versions of the S-4.

The documents related to the press release are internal Exelon documents reflecting preparation for statements to the media and to investors.  One of the statements in those documents reads: "We have also made significant progress on the financing front.  We have determined we can get the deal done at a refinancing level of approximately $4 billion (down from about $8.5 billion)."  (Pl.'s Ex. 15 at EXC0008914.)  That statement is consistent with Exelon's acknowledgement that at the time of the Exchange Offer it believed that a TopCo merger was likely to result from the Exchange Offer.  (Tr. 412-13.)  Exelon's confidence that NRG will eventually agree to a negotiated transaction is not inconsistent with a willingness to close the Exchange Offer and finance the entire NRG debt if the conditions of the Exchange Offer are satisfied and an alternative

17

negotiated transaction has not already occurred, rendering the Exchange Offer moot.

In any event, the documents related to the press release, taken together and in context, make plain that at the time the documents were drafted Exelon was contemplating the possibility of having to refinance the entirety of NRG's debt. In a prepared "Q&A," Exelon drafted its answer to the question: "If NRG won't enter into a negotiated transaction, doesn't Exelon need to refinance ~$8.5 of NRG debt . . . ?" Exelon's prepared answer conceded, albeit indirectly, that Exelon would be in the position of refinancing the entire bond debt if "Exelon and NRG are combined" through the Exchange Offer and the attendant second-step merger. Exelon quickly reasserted in its prepared answer that "[w]e believe the NRG board will eventually come forward to negotiate with us," and similarly, in an answer to a separate question, restated that refinancing $4 billion of NRG debt - i.e., the bank debt alone - "is all we believe will be required." (Pl.'s Ex. 15 at EXC0008016-17.)

There can be no doubt that the documents related to the November 11 press release reflect a desire to press upon the media and investors Exelon's strong belief that a negotiated transaction will result from the Exchange Offer and that the NRG bond debt will not have to be refinanced. However, that desire and that belief do not undermine the evidence in this case, in

18

the form of trial testimony and documentary evidence, that
although Exelon would prefer a negotiated merger, it has
contemplated the possibility of refinancing the entire bond
debt, and is prepared to do so if all of the conditions of the
Exchange Offer are satisfied.

29.   On January 7, 2009, Exelon's Vice President of Investor
Relations, Karie Anderson, responded to an email from a friend
asking if Exelon "need[ed] 100%" of NRG shareholders to tender
their NRG common stock in order to close the Exchange Offer.
Ms. Anderson replied: "no, we just need for the deal to go from
hostile to friendly . . . and we are using a multi-pronged
approach to pressure NRG management to negotiate with us."
(Pl.'s Ex. 74.)[5]   NRG argues that Ms. Anderson's response belies
Exelon's purported assumption that it may have to refinance the
NRG bond debt.   The response does not support that finding.   The
response merely reflects the truth that if the deal turned
friendly, Exelon would not need any percentage of NRG shares to
be tendered.[6]   The response also reflects that one purpose of the
Exchange Offer was to pressure the NRG Board into agreeing to a
consensual merger.   (See also Tr. 385.)   Exelon has never denied

---

[5]      Exelon objects to the admissibility of Ms. Anderson's email.   However,
the Court has considered the email and will accept its admissibility for
purposes of this dispute.   The email does not change the outcome of the
dispute.
[6]      It should be noted that closing the Exchange Offer does not require
obtaining 100% of the NRG shares.

that purpose and that purpose is not inconsistent with a
willingness to close the Exchange Offer if the deal has not
already turned friendly, rendering the Exchange Offer moot, and
the conditions of the Exchange Offer are satisfied.

30. Exelon's assumption that it may have to finance the
entirety of NRG's debt makes it less likely that Exelon harbors
a secret intent not to close the Exchange Offer even if the
conditions of the Exchange Offer are satisfied.

Exelon's Financial Incentive to Close the Exchange Offer

31. Exelon estimates that closing the Exchange Offer, even
assuming the need to refinance the NRG bond debt, will be value
accretive to Exelon shareholders. Specifically, Exelon
estimates that closing the Exchange Offer would create
approximately $1 to $3 billion in value to Exelon. (Tr. 160-61,
225, 228-30, 337-38.)

32. The plaintiff's fact witness, Mr. Baliff, conceded in his
testimony that the Exchange Offer would be value accretive to
Exelon including the need to refinance the entire bond debt.
(Tr. 45-46, 58-59.) Mr. Baliff testified on direct examination
that closing the Exchange Offer, including refinancing the
entire bond debt, would be a "very accretive deal" for Exelon,

20

and that the cost of the deal "could be borne tomorrow." (Tr.
46.)  Indeed, Mr. Baliff expressed concern that the deal was so
favorable to Exelon shareholders that it was "uneven" with
respect to any corresponding benefit to NRG shareholders. (Tr.
46-47.)

33.  NRG submits that Exelon's estimate of $1 to $3 billion in
value with respect to the Exchange Offer does not reflect the
cost of refinancing the bond debt, contrary to the testimony of
the Exelon executives.  However, NRG did not seek to contradict
the testimony of its own witness, Mr. Baliff, that closing the
Exchange Offer, including refinancing the bond debt, would be
value accretive to Exelon.

34.  In any event, the Court finds that Exelon's estimate of $1
to $3 billion did take into account the cost basis of
refinancing the bond debt.  There was no testimony contradicting
the testimony to that effect.  The documentary evidence offered
by NRG on this point is inconclusive at best.  NRG relies upon a
slide used by Exelon in presentations to investors beginning in
December 2008 entitled "Combination Expected to Create
Substantial Synergies."  (Pl.'s Ex. 507 at 16.).  The slide
indicates that the combination of Exelon and NRG is "expected to
create $1.5-$3 billion of value through synergies - with

21

opportunity for more."   The slide notes that the calculation of
value through synergies "[e]xcludes transaction and other costs
of $654 million and excludes increased interest expense related
to refinancing of NRG debt."   (Pl.'s Ex. 507 at 16.)   In
connection with the costs associated with refinancing the NRG
debt, the slide only indicates that it excludes the increased
interest expense of refinancing that debt.   It does not indicate
that it excludes the overall cost of refinancing the entire bond
debt.

Moreover, that slide is directly followed in the same
presentation by another slide entitled "Clear Value under
Multiple Scenarios."   (Pl.'s Ex. 507 at 17.)   The "Clear Value"
slide "look[s] at fundamental value creation under a wide range
of future commodity price scenarios and [estimates a value of]
$1-3 billion [for the Exchange Offer], possibly more."   (Pl.'s
Ex. 507 at 17.)   The "Clear Value" slide does not purport to
exclude any costs related to refinancing the NRG debt.   The
plaintiff's interpretation of the slides therefore requires
either ignoring the "Clear Value" slide or assuming that slide
omitted to mention the costs it was excluding.   That assumption
is unwarranted especially given the explicit notation of
excluded costs in the previous slide.   Moreover, NRG has not
offered any reasonable interpretation of the evidence that would
undercut the conclusion that the transaction is estimated to be

22

very profitable for Exelon even if it is required to refinance
NRG's bond debt.

35.  There is no evidence in the trial record to contradict the
testimony from multiple witnesses that closing the Exchange
Offer, including refinancing the entire NRG bond debt, would be
value accretive to Exelon.  Exelon's belief that the Exchange
Offer would be value accretive to Exelon, which appears to be
well-founded, makes it less likely that Exelon harbors a secret
intent not to close the Exchange Offer if the conditions of the
Exchange Offer are satisfied.

### Exelon's Negotiations with the NRG Bondholders

36.  As explained above, Exelon believes that it can acquire NRG
by means of the Exchange Offer without having to refinance the
entire bond debt because it is currently engaged in negotiations
with NRG bondholders that it believes are likely to result in a
waiver of the change of control rights that are the source of
the $4.7 billion figure.  (Tr. 329 (citing a "strong appetite"
on the part of the bondholders for the Exchange Offer to close
and for a negotiated settlement of the bond debt to be
reached).)  Exelon believes that the bondholders have a
financial incentive to waive their change of control rights for
a price in order to facilitate the closing of the Exchange Offer

because if Exelon reaches a TopCo merger agreement with the NRG
Board, the change of control provisions will not be triggered
and the bondholders will receive no change of control payment.
(Tr. 372-73.)  On the whole the bondholders have advised Exelon
that they are in favor of Exelon's acquisition of NRG.  (Tr.
327-29.)  NRG's consent is not required for Exelon to reach an
agreement with the individual bondholders providing for the
waiver of their change of control rights.  (Tr. 132.)  NRG has
estimated that the cost to Exelon of purchasing the NRG
bondholders' waiver of their change of control rights would be
approximately \$800 to \$950 million.  (Tr. 43.)

37.  Exelon's belief that it can acquire NRG through the
Exchange Offer without refinancing NRG's entire bond debt, by
negotiating with NRG's bondholders, makes the Exchange Offer
more appealing to Exelon and makes it less likely that Exelon
harbors a secret intent not to close the Exchange Offer if the
conditions of the Exchange Offer are satisfied.

## Exelon's Commitment to Retaining its Investment Grade Credit Rating

38.  Exelon is committed to retaining its investment grade
credit rating.  (Tr. 164-65, 219-20, 340.)  Exelon would not
complete a business combination with NRG if it thought doing so

24

would entail falling below investment grade.  (Pl.'s Ex. 32 at
EXC8815.)[7]

39.  When Exelon publicized its October 19, 2008 letter to the
NRG Board proposing a merger, all three rating agencies took
steps to downgrade Exelon's credit rating, put Exelon on
negative credit watch, or both.  (Tr. 242-43; Pl.'s Ex. 24 at
NRG 623.)  In particular, Standard & Poor's ("S&P") downgraded
Exelon's credit rating two notches, to the lowest level at which
it could continue to be investment grade, and also placed Exelon
on a negative watch list for further downgrade.  (Tr. 242-43;
Pl.'s Ex. 24 at NRG623.)

40.  Exelon was surprised to be downgraded upon publicizing the
October 19 letter.  (Tr. 220, 299-300.)

41.  Exelon cannot know with certainty whether closing the
Exchange Offer will result in losing its investment grade credit
rating, because it cannot obtain a "pre-rating" or "shadow
opinion" from a rating agency prior to closing a hostile
transaction.  (Tr. 48-51, 298.)  Exelon could only get a shadow

---

[7]    Whether Exelon's commitment to retaining an investment grade credit
rating constitutes a condition to the Exchange Offer that was originally
undisclosed is not a claim that was raised in the Complaint, and it was not
litigated in this trial.

opinion from a rating agency if the deal turned friendly.   (Tr.
416.)[8]

42.   Exelon's president and COO, Mr. Crane, believes it to be
"critical" for Exelon to receive a shadow opinion before closing
the Exchange Offer.[9]   Mr. Crane testified at trial that he could
not recall another substantial matter that Exelon has undertaken
without obtaining a shadow opinion.   (Tr. 296.)

43.   Mr. Crane characterized his belief that a shadow opinion is
critical for Exelon to acquire NRG as a "personal belief."   (Tr.
297.)

44.   Mr. Crane also testified that he reports to the CEO of
Exelon, Mr. Rowe.   (Tr. 310.)

45.   Mr. Crane testified that if Mr. Rowe were prepared to close
the Exchange Offer without the benefit of a shadow opinion, then

---

[8]     Exelon argues that the importance of retaining an investment grade
credit rating to Exelon is not probative of Exelon's intent with respect to
the Exchange Offer because the ratings agencies view the Exchange Offer in
the same light as a potential TopCo merger.   (Tr. 346-47.)   That argument
overlooks the distinction that Exelon would be able to obtain a shadow
opinion if the transaction were structured as a TopCo merger, but it could
not obtain such an opinion before closing the Exchange Offer.
[9]     Unless otherwise indicated, reference to the Exchange Offer encompasses
the second-step merger that would have to follow in order for Exelon to
acquire NRG.

he would be prepared "to go along with what Mr. Rowe has indicated."  (Tr. 310.)

46.   Mr. Crane testified that it is his understanding that Exelon is prepared to close the Exchange Offer without obtaining a shadow opinion in this case.  (Tr. 310.)

47.   Mr. Rowe testified that Exelon is willing to close the Exchange Offer without obtaining a shadow opinion in this case. (Tr. 220.)

48.   Mr. Hilzinger also testified that Exelon is willing to close the Exchange Offer without obtaining a shadow opinion in this case.  (Tr. 343.)

49.   Exelon has taken multiple steps short of obtaining a shadow opinion to assure itself that it will retain its investment grade rating upon closing the Exchange Offer.  In particular, Exelon has been in "constant communication" with the rating agencies "concerning their overall requirements for each level of investment rating."  (Tr. 220.)  Exelon has achieved "a very good idea of what it is we need to do to be investment grade." (Tr. 343.)

50. The Court finds, based on the testimony at trial, that
Exelon is willing to close the Exchange Offer without the
benefit of a shadow opinion. Therefore, Exelon's commitment to
retaining its investment grade rating does not support a finding
that Exelon harbors a secret intent not to close the Exchange
Offer even if the conditions of the Exchange Offer are
satisfied.

### The Section 203 Condition

51. Delaware General Corporation Law Section 203 would prohibit
Exelon from engaging in any business combination with NRG –
including the second-step merger – for a period of three years
even if Exelon were to obtain a strong majority ownership in NRG
through the Exchange Offer, unless certain exclusions apply.
(Tr. 78, 155; Defts.' Ex. 52 at 60-61.)

52. Exelon therefore conditioned the Exchange Offer on the
inapplicability of Section 203. (Defts.' Ex. 52 at 52.) That
condition was disclosed in the S-4. The S-4 also informed NRG
stockholders of the ways in which the condition could be
satisfied:

> The offer is subject to the condition that the board
> of directors of NRG shall have approved, in a manner
> reasonably satisfactory to Exelon, the offer and the
> second-step merger or any other business combination
> between NRG and Exelon (and/or any of Exelon's

28

subsidiaries) pursuant to the requirements of Section
203 of the DGCL, or Exelon shall be satisfied that
Section 203 does not apply to or otherwise restrict
the offer, the second-step merger described herein or
any such business combination.  This condition will be
satisfied if (1) prior to the acceptance for exchange
of shares of NRG common stock pursuant to the offer,
NRG's board of directors shall have unconditionally
approved the offer and the second-step merger or (2)
there are validly tendered and not withdrawn prior to
the expiration date a number of shares of NRG common
stock that, together with the shares of NRG common
stock then owned by Exelon, would represent at least
85% of the voting stock of NRG outstanding on the date
hereof (excluding shares of NRG common stock owned by
certain employee stock plans and persons who are
directors and also officers of NRG).

(Defts.' Ex. 52 at 60; Tr. 155.)

53.  The Section 203 condition can be satisfied in three ways.

First, as explained in the section of the S-4 reproduced above,

the NRG Board could approve the Exchange Offer and second-step

merger for the purposes of Section 203 prior to Exelon's

acceptance of NRG common stock for exchange of shares.

54.  Second, as also explained in the section of the S-4

reproduced above, 85% of NRG voting stock could tender by the

expiration date.  This percentage is measured as 85% of the

shares outstanding "at the time the transaction commenced,"

subject to certain adjustments for, among other things, shares

held by management directors.  (Tr. 105 (citing DGCL §

203(a)(2)).).  The Court accepts Exelon's representation, which

was not disputed at any point during the litigation, that NRG

has more shares outstanding today than on November 12, 2008 when

the Exchange Offer was commenced; and that Exelon would need to

achieve a tender of approximately 74.25% of the presently

outstanding shares to satisfy Section 203. As noted above, as

of February 25, 2008, Exelon had received over 51% of all

outstanding shares.

55.    Third, Exelon has filed suit in the Delaware Chancery Court

seeking to require the NRG Board to exempt the Exchange Offer

from Section 203 on the theory that not to do so would

constitute a breach of fiduciary duty by the NRG Board.   (Tr.

157; Defts.' Ex. 35 at Amended Verified Complaint for

Declaratory and Injunctive Relief, Exelon v. Cosgrove, No. 4155-

VCL.)

56.    NRG's expert witness, Professor Guhan Subramanian,

testified that the presence of the Section 203 condition makes

it unlikely that the Exchange Offer will be consummated.   (Tr.

77.)   However, he candidly acknowledged that he was offering no

opinion on whether Exelon intended to close the Exchange Offer.

(Tr. 102-03.)

30

57.   Professor Subramanian acknowledged that Section 203 conditions such as the one contained in the Exchange Offer are "common in hostile exchange offers" and "not unusual."   (Tr. 103-04.)

58.   Professor Subramanian opined that the most likely means by which the Section 203 condition may be satisfied is approval by the NRG Board.   (Tr. 84.)

59.   Professor Subramanian also opined that if the Section 203 condition were satisfied by means of NRG Board approval, the parties would most likely agree to a TopCo merger in order to avoid refinancing the NRG bond debt, and the Exchange Offer itself would not close.   (Tr. 85.)

60.   As noted above, the possibility that the Exchange Offer would result in an alternative negotiated business combination was disclosed in the S-4.

61.   Moreover, as also noted above, the S-4 disclosed that Exelon would continue to seek a negotiated business combination with NRG even as the Exchange Offer was pending.

31

62.   Accepting for purposes of this dispute Professor
Subramanian's opinion that the presence of the Section 203
condition makes closing the Exchange Offer unlikely, that NRG
Board approval is the most likely means of satisfying the
Section 203 condition, and that such approval would result in a
TopCo merger, those findings are not probative of whether Exelon
harbors a secret intent not to close the Exchange Offer if the
conditions of the Exchange Offer are satisfied.   The Section 203
condition itself is fully disclosed in the S-4 and the
difficulty of satisfying it has nothing to do with the claim
that Exelon harbors a secret intent not to close the Exchange
Offer even if the conditions, including the Section 203
condition, are satisfied.   Moreover, there is nothing secret
about the possibility that the Exchange Offer may result in an
alternative negotiated transaction, and that Exelon in fact
desires a negotiated transaction.   As explained above, that is
disclosed in the S-4.

63.   Professor Subramanian also acknowledged that it is possible
that Exelon will satisfy the Section 203 condition by reaching
the 85% threshold.   (Tr. 104-05.)

64.  NRG's fact witness, Mr. Baliff, also acknowledged the
possibility that Exelon will satisfy the Section 203 condition
by reaching the 85% threshold.  (Tr. 62.)

65.  Thus, the presence and nature of the Section 203 condition
do not belie Exelon's intent to close the Exchange Offer if all
of the conditions of the Exchange Offer are met, including the
Section 203 condition.

## The S-4 Effectiveness Condition

66.  In order for the Exchange Offer to close, the S-4 filed by
NRG in connection with the Exchange Offer must become effective
under the Securities Act of 1933.  (Defts.' Ex. 52 at iv, 52.)

67.  The S-4 is not yet effective.  (Tr. 171.)

68.  Exelon filed its initial S-4 on November 12, 2008.  Since
that time, the SEC has provided comments to Exelon in letters,
and Exelon has amended the S-4 four times on the basis of those
comments and other developments.  (Tr. 138, 143-45; Defts.' Exs.
45, 49, 52, 55.)  There is no evidence in the record that Exelon
has failed to take any step necessary to making its S-4
effective.

69.   Exelon responded to one letter from the SEC (Defts.' Ex. 41) in under one month (Pl.'s Exs. 3 & 4), a second letter from the SEC (Pl.'s Ex. 2) in over one month (Pl.'s Ex. 7 & 8), and a third letter from the SEC (Pl.'s Ex. 5) in two weeks (Pl.'s Exs. 6 & 9).  Contrary to NRG's argument, those response intervals do not support a finding that Exelon is deliberately delaying the effectiveness of the S-4.  NRG did not provide any expert testimony or other evidence to the effect that those intervals are suspiciously or even unusually lengthy.  On their face they do not appear unreasonable.  They prove nothing.

70.   The expert witnesses for NRG and Exelon disagree as to whether the S-4 has been outstanding without becoming effective for an unusually long time.  Professor Subramanian, NRG's expert witness, testified that if the S-4 were to become effective presently, "it would still be on the longer end of comparable transactions."  However, Professor Subramanian acknowledged that the lapse of time has "not [been] extreme."  (Tr. 92-93.) Professor Daniel Fischel, Exelon's expert, disputed Professor Subramanian's finding that the delay has been "on the longer end" because he disagrees with the method by which Professor Subramanian chose his sample.  (Tr. 434-35.)

71.   The Court accepts, for purposes of this dispute, Professor
Subramanian's finding that the lapse of time between the
initiation of the Exchange Offer and the present is "on the
longer end" among comparable transactions.

72.   Professor Subramanian's finding does not support a finding
that Exelon is deliberately sabotaging its Exchange Offer by
failing to satisfy one of the conditions; that Exelon is
neglecting one of the conditions because it has no intention of
closing the Exchange Offer; or that Exelon is otherwise
manifesting a secret intent not to close the Exchange Offer even
if the conditions of the Exchange Offer are satisfied.
Professor Subramanian testified that the lapse of time between
the filing of the S-4 and the present has not been on the
extreme end of comparable transactions.  Moreover, Professor
Subramanian offered no testimony regarding what constitutes a
normal amount of time between the effectiveness of an S-4 and
the closing of a transaction.  Professor Fischel testified that
in a typical transaction, "the S-4 doesn't become effective
until approximately one month before the completing of the
transaction."  (Tr. 435.)  Although at the time this lawsuit was
brought, and at the time of the trial, the next deadline for NRG
shareholders to tender their shares pursuant to the Exchange
Offer was June 26, 2009, neither party represented that June 26

was the deadline for the Exchange Offer to close. Indeed, on June 17, 2009 the deadline for NRG shareholders to tender their shares was extended to August 21, 2009. There was no basis at the time of the trial, and there is no basis now, to conclude that the Exchange Offer is within a month of any closing deadline.

## The Shareholder Approval Condition

73. Exelon conditioned the Exchange Offer on the approval of its shareholders to issue the shares of Exelon stock that would be sufficient to complete the Exchange Offer and the second-step merger in accordance with the rules of the New York Stock Exchange. (Defts.' Ex. 52 at 52.)

74. For purposes of this dispute, the Court accepts Professor Subramanian's finding that Exelon could have avoided the need for its own shareholders' approval by either buying a "toe hold" stake in NRG, i.e., the number of shares necessary to decrease Exelon's potential share issuance below 20% of its outstanding shares, which number NRG did not establish, or by converting part of the Exchange Offer consideration to cash. (Tr. 93-95.)

75. Exelon's decision to condition the Exchange Offer on the approval of its shareholders cannot support a finding that

36

Exelon secretly intends not to close the Exchange Offer if all
of the conditions of the Exchange Offer are satisfied.   The
shareholder approval condition was disclosed in the S-4.   There
is no claim in this litigation that the shareholder approval
condition or any other condition of the Exchange Offer is
impermissible.   The argument pressed by NRG that the very
existence of the shareholder approval condition is proof that
Exelon intends not to close the Exchange Offer even if its
conditions, including the shareholder approval condition, are
satisfied, is unpersuasive.   The existence of a condition cannot
itself constitute proof that Exelon will not close the Exchange
Offer even if that condition is satisfied.

76.   In any event, the uncontradicted testimony at trial was
that Exelon has a business policy of openness with its
shareholders.   (Tr. 148-49.)   It is legitimate for Exelon to
seek the input of its shareholders regarding a major corporate
transaction, and to defer to the wishes of the shareholders.
Professor Subramanian performed no empirical analysis of the
frequency with which hostile bidders acquire toe-holds to avoid
the need to obtain the consent of their own shareholders for the
transaction.   (Tr. 95.)   He also made it clear that he was
expressing no opinion on the right way to structure the
transaction.   (Tr. 94.)

77.   Exelon has not yet sought the required approval from its
shareholders to close the Exchange Offer.   (Tr. 174-76.)

78.   On April 17, 2009, Exelon filed a proxy for a special
shareholder meeting at which it could seek the required
approval, but Exelon did not set a date for the meeting.   (Tr.
178-79.)

79.   Exelon's failure to seek the required shareholder approval
for the Exchange Offer at this stage does not support a finding
that Exelon deliberately inserted the shareholder approval
condition in order to sabotage the Exchange Offer; that Exelon
is neglecting the shareholder approval condition because it has
no plans ever to close the Exchange Offer; or that Exelon is
otherwise manifesting any secret intent not to close the
Exchange Offer even if the conditions of the Exchange Offer are
satisfied.

80.   Exelon can seek shareholder approval within 20 days after
mail notice.   (Tr. 149-50; Defts.' Ex. 60 at §§ 2.01(a),
2.03(a).)

81.   There is nothing in the record to suggest that any internal or external deadline for Exelon to close the Exchange Offer is approaching within approximately 20 days.

82.   During the course of the trial, Exelon presented testimony that it was waiting to ask for shareholder approval until "the path forward is more clear, where we have made greater progress" with respect to the Exchange Offer.  (Tr. 149 ("[W]e are still at a point in time where there are miles to go, so to speak, before getting to the end of the transaction").)

83.   That is a credible justification for waiting to ask for shareholder approval, particularly given the uncertainty of the Exchange Offer due to the hurdles presented by its various conditions, many of which have been emphasized in this litigation by NRG.

84.   Neither the existence of the shareholder approval condition, nor Exelon's failure to seek the required approval to date, supports a finding that Exelon harbors a secret intent not to close the Exchange Offer if the conditions of the Exchange Offer are satisfied.

### Exelon's Preference for Obtaining Due Diligence

85.  Exelon has never consummated a substantial transaction of
the kind contemplated in this case without conducting due
diligence.  (Tr. 269.)  Due diligence is the disclosure of
nonpublic information from the other party to the transaction -
here, NRG.  (Tr. 269.)

86.  Exelon did not condition the Exchange Offer on obtaining
due diligence from NRG.  (Tr. 234.)  Closing the Exchange Offer
would require foregoing due diligence in the acquisition of NRG.

87.  Exelon's inability to conduct due diligence before closing
the Exchange Offer does not support a finding that Exelon
secretly intends not to close the Exchange Offer if all of the
conditions to the Exchange Offer are satisfied.  The Exelon
Board unanimously approved that the Exchange Offer be made
without a due diligence condition.  (Tr. 234-35.)  Exelon's
executives testified at trial that they do not regard due
diligence to be necessary in the acquisition of NRG because the
companies operate in the same industry, Exelon already has a
wealth of knowledge about NRG's markets and assets, and NRG is a
public company that makes extensive public filings, including
with respect to its financial statements.  (Tr. 136, 234-35,
324-25, 390-91, 469.)  That testimony is credible, particularly

40

in light of the deposition testimony of NRG's CEO, David Crane,

who testified that due diligence "would not . . . lead to . . .

a materially different viewpoint" on the value of the

transaction.   (David Crane Dep. 101.)


## Exelon's Proxy Solicitation

88.  On November 10, 2008, Exelon sent NRG a letter announcing

its intention to present a proposal at the next NRG annual

shareholder meeting to expand the size of the NRG Board.  Exelon

also announced its intention to nominate directors to fill the

newly created directorships, and to nominate candidates to fill

other vacancies.  (Defts.' Ex. 36.)  The net effect of the proxy

proposal was to allow Exelon to nominate nine out of a newly

constituted NRG Board of nineteen directors.  (Defts.' Ex. 36.)[10]


89.  One of the chief purposes of the proxy solicitation is to

alter the composition of the NRG Board such that the NRG Board

will favor negotiating an alternative business combination with

Exelon.  (Tr. 192.)

---

[10]     In correspondence received after the conclusion of the trial, the
parties indicated that the next NRG annual shareholder meeting is scheduled
for July 21, 2009, and that Exelon began soliciting proxies for the
shareholder proposals Exelon intends to present at that meeting on June 17,
2009.

41

90.  A reconstituted NRG Board could also facilitate closing the Exchange Offer.  (Tr. 192.)

91.  Exelon crafted its proxy solicitation such that if it is successful, Exelon's nominees will still constitute less than a majority of the NRG Board.  Exelon crafted its solicitation in that way in order to avoid triggering the same change of control provisions that would force Exelon to refinance the approximately $4.7 billion of NRG bond debt if Exelon closed the Exchange Offer.  (Tr. 192.)

92.  Exelon's crafting of the proxy solicitation is consistent with its purported willingness to close the Exchange Offer if all of the conditions are satisfied, and with its fully disclosed desire for a negotiated transaction.  It would not make sense to trigger the change of control provisions requiring the refinancing of the bond debt before the possibility of a negotiated transaction that would avoid such refinancing were fully exhausted.  Indeed, NRG elicited testimony that one purpose of the proxy solicitation was to facilitate a negotiated transaction.  (Tr. 192-93.)  It would be paradoxical if the success of the proxy solicitation were to trigger the very change of control provisions that the proxy solicitation was undertaken to avoid.  Therefore, the manner in which Exelon

crafted its proxy solicitation does not support a finding that Exelon harbors a secret intent not to close the Exchange Offer if the conditions of the Exchange Offer are satisfied.

### Exelon's Extension of the June 26, 2009 Deadline

93.  As noted above, on June 17, 2009, two weeks after the conclusion of the trial, Exelon extended the deadline by which NRG shareholders could tender into the Exchange Offer from June 26, 2009 to August 21, 2009.

94.  NRG argues that this extension constitutes evidence that Exelon harbors a secret intent not to close the Exchange Offer if the conditions of the Exchange Offer are satisfied.  That argument is without merit.  NRG fails to explain the link between extending the deadline to tender shares into the Exchange Offer and an alleged secret intent never to close the Exchange Offer.  Exelon never represented in its S-4 or elsewhere that June 26, 2009 was a final deadline for closing the Exchange Offer or that it would not extend the deadline by which NRG shareholders could tender their shares.  Indeed, prior to the most recent extension of the deadline for NRG shareholders to tender their shares, Exelon had already extended such deadlines twice.  There was nothing sacred about the June 26, 2009 deadline or about the previous deadlines, and those

43

deadlines did not represent dates by which the Exchange Offer had to close.  There is no basis to infer from the fact of the extension, at a time when all of the conditions of the Exchange Offer have not been satisfied, that Exelon secretly intends not to close the Exchange Offer if the conditions of the Exchange Offer are ultimately satisfied.  Indeed, if anything, the extension of the Exchange Offer at a time when all of the conditions have not yet been satisfied provides more time for those conditions to be satisfied, thus making it more likely that the Exchange Offer will eventually close.  In sum, the extension of the June 26 deadline does not support a finding that Exelon secretly intends not to close the Exchange Offer if all of the conditions of the Exchange Offer are satisfied.

## CONCLUSIONS OF LAW

95.  NRG's claim arises under Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), and the Court has subject matter jurisdiction over this matter pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

96.  Section 14(e) of the Williams Act makes it unlawful for any person "to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the

statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders . . . ." 15 U.S.C. § 78n(e). "In order to prove a violation of [Section] 14(e), a party must establish: (1) that the defendant made an untrue statement of fact or omitted to state a fact necessary to make statements made not misleading in connection with a tender offer; (2) that the misstatement or omission was material; and (3) that the defendant acted with either 'knowledge of falsity, or a reckless disregard for the truth.'" Am. Insured Mortgage Investors v. CRI, Inc., No. 90 Civ. 6630, 1990 WL 192561, at *6 (S.D.N.Y. Nov. 26, 1990) (quoting Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 961 (2d Cir. 1987)).

The parties do not dispute that the concealment of a secret intent never to close the Exchange Offer even if its conditions were satisfied would be a material misrepresentation under the Williams Act.

97. Because NRG seeks an injunction requiring Exelon to amend its S-4, and also an injunction requiring Exelon to withdraw its Exchange Offer as currently constituted, NRG must also satisfy the equitable requirements for obtaining a permanent

45

injunction.[11]  First, "[t]o obtain a permanent injunction, a

plaintiff must succeed on the merits . . . ."  Roach v. Morse,

440 F.3d 53, 56 (2d Cir. 2006).  A plaintiff seeking a permanent

injunction must also satisfy a four-factor test by establishing:

"(1) that it has suffered an irreparable injury; (2) that

remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering

the balance of hardships between the plaintiff and the

defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent

injunction."  eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391

(2006).  The "traditional standards for extraordinary equitable

relief" apply to Williams Act claims.  Rondeau v. Mosinee Paper

Corp., 422 U.S. 49, 57 (1975).


98.  Following this Court's resolution of Exelon's motion to

dismiss the Complaint, the only outstanding claim in this case

is that Exelon's representation in the S-4 that the purpose of

the Exchange Offer is to acquire NRG through the Exchange Offer

provided certain conditions are satisfied is false, because

Exelon harbors a secret intent never to close the Exchange Offer

---

[11]    NRG acknowledges in its post-trial Proposed Findings of Fact and
Conclusions of Law that the remedy it seeks would constitute a permanent
injunction.

even if all of the conditions of the Exchange Offer are satisfied.

99.  For all of the reasons explained in the Court's Findings of Fact, the testimony and documentary evidence developed over the course of the trial do not support the inference that Exelon harbors such a secret intent.

100. NRG has not shown that Exelon's stated willingness to close the Exchange Offer if all of the conditions of the Exchange Offer are satisfied is false.

101. Therefore, NRG has failed to prove that Exelon made a false statement or material omission with respect to the Exchange Offer, and has failed to prove its Williams Act claim.

102. NRG is not entitled to injunctive relief, because it has not succeeded on the merits of its claim or suffered harm from any misrepresentation by Exelon.

103. Because NRG is not entitled to injunctive relief due to its failure on the merits, it is unnecessary to determine whether any harm NRG would suffer from a phantom exchange offer would constitute sufficient irreparable harm to justify injunctive

relief.  The Court notes, however, that NRG is free to make its case to its shareholders as to why the Exchange Offer should be rejected.


CONCLUSION

The Court has considered all of the arguments of the parties.  To the extent not specifically discussed, the arguments are moot or without merit.  For the reasons explained above, Exelon is entitled to a judgment dismissing NRG's Complaint.  The Clerk is directed to enter Judgment and to close this case.


**SO ORDERED.**

Dated:      **New York, New York**
            **June 19, 2009**

John G. Koeltl
United States District Judge